Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Andrew J. Somers, #19078
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
andrew@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANNE L. and S.L.,<br><br>       Plaintiffs,<br><br>vs.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, and STARLING PHYSICIANS P.C.,<br><br>       Defendants. | COMPLAINT |

Plaintiffs Anne L. ("Anne") and S.L. through their undersigned counsel, complain

and allege against Defendants United Healthcare Insurance Company, United Behavioral

Health (collectively "United"), and Starling Physicians P.C. ("the Plan Administrator"),

as follows:

**PARTIES, JURISDICTION AND VENUE**

1

1. Anne and S.L. are natural persons residing in Hartford County, Connecticut. Anne is S.L.'s mother.

2. United Healthcare Insurance Company acted as insurer and claims administrator, as well as a fiduciary under ERISA for the insurance plan providing coverage for the Plaintiffs ("the Plan") during the treatment at issue in this case.

3. United Behavioral Health is the mental health arm of United Healthcare Insurance Company and assisted in processing the relevant appeals and claims at issue in this case. United also, at times operates under the brand name Optum.

4. At all relevant times United acted as agent for the Plan and the Plan Administrator.

5. The Plan Administrator is the designated administrator for the Plan.

6. The Plan is a fully insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA").

7. S.L. received medical care and treatment at the Huntsman Mental Health Institute f/k/a University Neuropsychiatric Institute ("UNI") from January 24, 2022, through February 28, 2022, and at Elevations RTC beginning on May 19, 2022. These are treatment facilities located in Salt Lake County Utah and Davis County Utah respectively, which provide inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

8. United denied claims for payment of S.L.'s medical expenses in connection with her treatment at UNI and Elevations.

9. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

2

10. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because United does business in Utah and has a large claims processing facility in Salt Lake County where the claims and appeals relevant to this case were sent for processing, and the treatment at issue took place in Utah.

11. In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

12. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages against the Plan Administrator pursuant to 29 U.S.C. §1132(c) based on the failure of the Plan Administrator and its agents, to produce within 30 days documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

//

//

//

## BACKGROUND FACTS

### UNI

13. S.L. was admitted to UNI's residential program on January 24, 2022, due to issues which included anxiety, substance use, self-harm (including cutting on her arms and face), and multiple suicide attempts which had not been able to be resolved at other levels of care including four inpatient hospitalizations, the first of which occurred in July of 2020.

14. In a letter dated June 6, 2022, United denied payment for S.L.'s residential treatment at UNI. The letter stated that January 22, 2022, through January 24, 2022, were the dates which had been reviewed and offered the following justification for the denial:

> The criteria were not met because:
>
> - You didn't need intensive 24-hour hospital services.
>
> In your case
> - You were doing somewhat better.
> - You were more cooperative and responsive to staff.
> - You were not acting on every impulse.
> - You were not behaving unsafely toward self or others.
> - You were taking your medications.
> - You were doing your dally activities.
> - You participated in treatment.
> - You had family support.
>
> Care and recovery could have continued in a less intensive setting.

15. On January 17, 2023, Anne submitted an appeal of the denial of payment for S.L.'s treatment at UNI. Anne stated that she had been notified through Explanation of Benefits statements that treatment had also been denied by United due to an alleged failure by UNI to notify United of S.L.'s admission.

16. Anne wrote that she was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified

4

reviewers whose identities were clearly disclosed, which took into account all of the information she provided, and which gave her the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave her the information necessary to perfect the claim.

17. She asked that the reviewer have experience treating individuals with S.L.'s diagnoses and that they be trained in the details of MHPAEA to respond to her allegations concerning a violation of the statute.

18. Anne argued that S.L.'s treatment was medically necessary and included a letter of medical necessity from one of S.L.'s psychologists at UNI. In an undated letter Katherine Havlik, Ph.D, BCBA, wrote in part:

> I served as [S.L.]'s psychologist from 12/13/21 through 2/28/22 during her admission to the Huntsman Mental Health Institute Comprehensive Assessment and Treatment Program. Prior to [S.L.]'s HMHI CAT admission, her parents reported that she had participated in regular outpatient therapy with limited benefit. During 2020-2021, [S.L.] experienced multiple suicide attempts resulting in several inpatient psychiatric hospitalizations.
>
> As part of [S.L.]'s HMHI admission, she participated in a comprehensive neuropsychological evaluation. Results of this evaluation supported diagnoses of Major Depressive Disorder (Severe, Recurrent, without Psychotic Features), Generalized Anxiety Disorder, Other Specified Trauma and Stressor Disorder, Attention/Deficit Hyperactivity Disorder (Inattentive Type), Cannabis Use Disorder (Moderate), and emerging Borderline Personality Traits.
>
> At the time of [S.L.]'s discharge, her HMHI treatment team strongly recommended that she transition directly to a residential treatment program. Due to [S.L.]'s history of self-harm, suicidal ideation, disordered eating, and substance use, she presented with a considerable risk of decompensation should she prematurely transition to a lower level of care. At the time of this recommendation, her team believed that [S.L.] posed a high risk of engaging in ongoing unsafe and potentially lethal behaviors should she transition to a less structured and restrictive setting.
>
> Although I have not treated [S.L.] since February 2022, her parents have informed me that her condition has continued to deteriorate, and that at this time her mental health remains unstable. Mr. and Mrs. [L.] strongly believe that [S.L.] requires

ongoing mental health treatment at a high level of care (i.e., a residential treatment program) for further stabilization

19. Anne expressed concern that United had made no reference to any of S.L.'s medical records to support its decision and the denial letter offered "absolutely no meaningful information" about S.L.'s condition in its assessments.

20. Anne wrote that while S.L. had made progress while in treatment, S.L. was starting from an extremely elevated baseline of multiple suicide attempts and inpatient hospitalizations.

21. She argued that S.L. should have qualified for treatment at UNI under the CALOCUS-CASII criteria. She went through the criteria point by point and argued that S.L.'s risk of harm, functional status, comorbid conditions, highly stressful and minimally supportive recovery environment, along with her poor response to lower levels of care, and limited engagement in services clearly demonstrated that S.L.'s treatment at UNI was medically necessary.

22. Anne argued that S.L.'s treatment at UNI met the CALOCUS-CASII criteria both because she would have had a score of four in one or more of the "risk of harm," "functional status," or "co-occurrence of conditions" categories which should have automatically qualified her for residential care regardless of her other scores, and also because S.L.'s composite score also qualified her for care at the residential level.

23. Anne shared excerpts from S.L.'s medical records which showed concerning behaviors such as purging and restricting food intake, intentional self-injury, angry and reactive behaviors, threats to kill herself, ongoing trauma from sexual assault, and a history of substance use which made S.L.'s treatment medically necessary.

24. In addition Anne asked United to perform a parity analysis on the Plan and to be provided with a copy of all documents under which the Plan was operated, including all governing

plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

25. In a letter dated February 22, 2023, United upheld the denial of payment for S.L.'s treatment at UNI. The reviewer gave the following justification for the denial:

> Based on my review of the request, including any supporting documentation which may have been submitted with your appeal letter, I have determined that the date(s) of service 02/28/2022 through 05/13/2022 have not been approved for payment. According to Program and Network Integrity (PNI) review, the denial is upheld for Current Procedural Terminology (CPT) 99213 for the date(s) of service 02/28/2022(1 unit for each date of service). Documentation does not support service billed. The medical documentation failed to include the required elements when rendering services per the behavioral health services documentation requirements reimbursement policy. The following was not documented:
>
> o Legible identity of the provider with credentials. The rendering providers name and/or credentials was not indicated in the medical records received. Furthermore, illegible signature.
> The denial is upheld for Current Procedural Terminology (CT) 90836 for the date(s) of service 02/28/2022(1 unit for each date of service). Documentation does not support service billed. The medical documentation failed to include the required elements when rendering services per the behavioral health services documentation requirements reimbursement policy. The following was not documented:
> o Legible identity of the provider with credentials. The rendering providers name and/or credentials was not indicated in the medical records received.
> o Start and stop times or total time of session for time-based codes
> Furthermore, illegible signature.
>
> The denial is upheld for Current Procedural Terminology (CPT 99213 for the date(s) of service 05/13/2022(1 unit for each date of service). The documentation does not support the service billed. The medical claim indicates telehealth by modifier and/or Place of Service (POS), however; the medical records fail to identify that the service was rendered via telehealth.

7

The denial is upheld for Current Procedural Terminology (CT) 90833 for the date(s) of service 05/13/2022(1 unit for each date of service). The documentation does not support the service billed. The medical claim indicates telehealth by modifier and/or Place of Service (POS), however; the medical records fail to identify that the service was rendered via telehealth. Furthermore, the medical documentation failed to include the required elements when rendering services per the behavioral health services documentation requirements reimbursement policy. The following was not documented:
o Start and stop times or total time of session for time-based codes
o Clear and uniform modifications of time; any error is to be lined through so that it can still be read, then dated and initialed by the person making the change.

26. On June 22, 2023, Anne asked for the denial of payment to be evaluated by an external review agency. Anne noted that the denial letter referenced the denial being upheld for May 13, 2022, but pointed out that this was months after S.L. was discharged from UNI.

27. Anne also stated that the letter improperly cited to procedure codes for outpatient care when UNI properly billed S.L.'s inpatient residential treatment using revenue code 1001.

28. She referred to United's denial as concerning and nonsensical, and stated that United failed to properly review the clinical evidence she had provided.

29. She asked for the next reviewer to be appropriately qualified and requested that they thoroughly review the significant clinical evidence she had provided, including the information contained in her initial appeal.

30. Anne received no response to this external review request.

**Elevations**

31. Following her discharge from UNI, S.L. was admitted to a facility called Sunrise Academy, but was unsuccessful in her treatment. She then went to a facility called Vive Adolescent Care but was also unsuccessful there. S.L. was then admitted to Elevations.

32. S.L. was admitted to Elevations on May 19, 2022.

8

33. In a letter dated May 23, 2022, United denied payment for S.L.'s treatment at Elevations. The letter stated in pertinent part:

> As described in your Benefit Plan Summary, Administrative Adverse benefit determination was issued on 05/20/2022 1:30 PM to Elevations RTC for requested service of mental health residential level of care on 05/20/2022. After a review of the member's benefit for mental health residential level of care, Optum reviewer [sic] has determined that coverage for this requested service is not available due [sic] Service Components Do Not Match Mental Health Residential Treatment Center as outlined in CASII/Child and Adolescent Services Intensity Instrument 05/19/2022 forward. Notified service provider, UR Sarah of Administrative Adverse benefit determination and appeal rights on 05/20/2022 1:30 PM. Requested UR notify member [S.L.] of adverse determination and appeal rights on 05/20/2022 1:30 PM. Advised written notification including appeal rights will be provided, gave appeals number 866-556-8166.

34. The letter gives no detail about which particular plan requirements Elevations allegedly failed to satisfy, does not specify which elements of the CASII criteria were allegedly not met, and does not reference any provisions of the Plaintiffs' benefits booklet or other governing plan documents which Elevations supposedly failed to meet.

35. On November 10, 2022, S.L.'s father ("Tom") submitted an appeal of the denial of payment for S.L.'s treatment. Tom wrote that when S.L. was admitted to Elevations, the facility contacted United to obtain approval, but was told that Elevations was in an "unavailable status" and the authorization would be denied.

36. Tom stated that he had additionally received letters from United requesting medical records and he stated that these would be provided.

37. Tom asked for the full, fair, and thorough review to which he was entitled under ERISA and asked the reviewer to meaningfully respond to the arguments and evidence he presented. He asked for a physical copy of all documentation related to the adverse determinations, including any internal case notes or reports.

9

38. He wrote that United referenced "the terms of your benefit plan" and the CASII criteria generally but failed to identify any specific requirements that S.L. supposedly failed to meet.

39. He asked United to provide him with an itemized declaration of "all issues resulting in Elevations' "unavailable status"' and asked United to expound on how its decision to deny coverage was consistent with the terms of the governing plan documents.

40. Tom voiced his concern that United was relying on an undisclosed internal protocol to restrict care at Elevations and asked United to be fully transparent with its justification for denying payment. He reminded United that it had an obligation to act in his best interest.

41. Tom contended that Elevations met all the listed requirements in his benefits booklet for residential treatment care to be approved. He also noted that Elevations was licensed and operated in accordance with state law and was fully accredited by The Joint Commission "which further demonstrates their commitment to excellence in healthcare."

42. He also argued that in addition to the definition of a residential treatment center, Elevations met the definition of an "alternate facility" as defined by his benefits booklet and met the requirements in the CASII guidelines as well. Further, he alleged that Elevations was a network provider with United until March of 2022 at which point United began blacklisting the facility even though the nature and intensity of its services did not change.

43. Tom voiced his concern that United's denial was a violation of MHPAEA. He wrote that MHPAEA compelled insurers to ensure that benefits for mental health services were offered at parity with benefits for analogous medical or surgical services.

44. Tom identified skilled nursing, subacute rehabilitation, and inpatient hospice care as some of the relevant medical or surgical analogues to the treatment S.L. received.

45. Tom argued that United was imposing limitations based on facility type, provider specialty, or other criteria that limited the scope or duration of benefits in violation of MHPAEA.

46. Tom stated that he had evidence that United did not limit its automatic denials to Elevations. He provided a list of some of the other residential treatment centers that United flagged for automatic denial irrespective of the relevant plan terms.

47. Tom wrote that he was unaware of any analogous medical or surgical facilities United flagged for automatic denial in this way and asked if he was mistaken for United to provide evidence of it doing so.

48. Tom argued that United also violated MHPAEA by requiring residential treatment centers to satisfy more rigorous requirements for treatment to be approved than it did for analogous medical or surgical facilities.

49. He requested that United perform a MHPAEA compliance analysis to ensure that the Plan was being administered in accordance with the statute and asked for physical copies of the results of this analysis. He again asked for a copy of the Plan Documents.

50. Tom argued that S.L.'s treatment was medically necessary and that he would not have taken on the emotional and financial burden of residential care if he had any other safe and effective option for treating S.L. He encouraged the reviewer to carefully analyze S.L.'s medical records themselves so that they could see why treatment was necessary.

51. In a letter dated January 24, 2023, United upheld the denial of payment for S.L.'s treatment. The letter gave the following justification for the denial:

> I reviewed your case on appeal
> I've uphold [sic] a denial for the medical services listed below:
> Child &Adolescent Service Intensity Instrument® (CASII) level 5: non-secure 24-hour services with psychiatric monitoring (mental health residential treatment) for dates of service from 05/19/2022 and forward
> I've uphold [sic] a denial because elevations [sic] residential treatment center (RTC) did not meet clinical service guidelines for residential level of care. The facility has been designated as not available for authorization. Your treatment could've been provided at the [sic] residential facility that offered services consistent with guidelines.
> Further questions regarding this status can be directed to Optum practice management. Please discuss your treatment with your provider.
> If you would like general information about the guidelines used for this decision, please visit https://www.providerexpress.com/content/ope-provexpr/us/en/clinical resources/guidelines-policies.html.[1] To get a copy of the specific guideline used for this decision free of charge, please call us at 1-866-556-8166.

52. On May 5, 2023, Tom asked for the denial of payment to be evaluated by an external review agency. He reiterated that S.L.'s treatment remained medically necessary and was a covered benefit under the terms of the Plan.

53. Tom argued that United's processing of his previous appeal had been problematic. He wrote that he confirmed United's receipt of his appeal on November 15, 2022, but after not hearing back from United for two months, he contacted them in January of 2023, and was told that the appeal review had been "cancelled in error" and would have to be reprocessed.

54. He lamented that United had yet to identify with any specificity what, if any, records it reviewed and had not provided him with the documentation he requested. He stated that

---

[1] The link appears to be missing a hyphen between the words clinical and resources, meaning that a broken link is returned. When the typo is corrected, the destination page contains links to brief descriptions of a wide variety of different criteria. For instance, the page offers links to telehealth practice parameters and criteria for electroconvulsive therapy. The CASII criteria mentioned by the reviewer do not appear on the page. The page does contain a link to the CALOCUS-CASII criteria, but these are separate criteria which largely supplanted the CASII criteria. Most importantly, the link offers no explanation as to why United refused to cover care at Elevations.

he had directly asked United to specify in detail what specific requirements Elevations allegedly failed to meet, but United continued to offer a "vague and conclusory form letter" which made no attempt to refute or acknowledge his arguments or articulate with any degree of specificity United's reasoning.

55. He wrote that contrary to United's assertion that S.L.'s treatment "could've been provided at the residential facility that offered services consistent with guidelines[,]" he was unable to find ANY aspect of the guidelines which had not been met. He again went through the guidelines point by point and argued that S.L.'s treatment was fully consistent with all the requirements.

56. He reiterated that Elevations satisfied the appropriate plan terms, was licensed, was accredited by The Joint Commission, and had been a network provider under United until quite recently.

57. He asked the reviewer to make direct references to the clinical evidence and other documentation utilized to support their decision. He included copies of S.L.'s medical records and a letter of medical necessity with the appeal and argued that S.L.'s treatment at Elevations was "necessary and appropriate."

58. Tom wrote that S.L. had historically shown "poor resiliency and response to treatment services," and had so far had four inpatient admissions and nine reported suicide attempts.

59. In a letter dated May 24, 2023, United stated that the Plaintiffs' external review request was rejected as external review was only available for denials issued due to:

> medical necessity, appropriateness, health care setting, level of care, effectiveness of the health care service, experimental and/or investigational, eligibility to participate in the health carrier's health benefit plan or rescission of coverage.

60. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

61. After multiple unsuccessful attempts to receive the documentation to which she was entitled, Anne made one last request by sending a request directly to United and the Plan Administrator. In certified mail, return receipt requested, letters dated January 23, 2024, she asked to be provided with:

- Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for my daughter, [S.L.], at Huntsman UNI and Elevations RTC, copies of those individuals' *curriculum vitae*, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for [S.L.]'s claim;
- A complete copy of both the medical necessity criteria utilized by United Healthcare Insurance Company in determining that [S.L.]'s treatment was not medically necessary and that treatment for her at a lower level of care was appropriate;
- A complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment.  This is necessary to allow me to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;
- Copies of documents identifying the self-compliance analysis the Plan and United Healthcare Insurance Company have carried out to determine the extent to which they are complying with the federal Mental Health Parity and Addiction Equity Act.
- Complete copies of any and all internal records compiled by United Healthcare Insurance Company and Starling Physicians in connection with [S.L.]'s claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;
- A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which [S.L.]'s insurance plan is operated;
- Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you, the plan administrator, and United Healthcare Insurance Company; and
- Copies of any and all documents outlining the level of accreditation required for residential treatment programs;
- Copies of any and all documents showing whether analogous levels of care to residential treatment programs also require these levels of accreditation; and
- Copies of documents identifying the process, strategies, evidentiary standards, or other factors the Plan used to determine that the treatment at Huntsman UNI and Elevations RTC was experimental and investigational.

- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to determine whether treatment at sub-acute inpatient programs for medical or surgical treatment is experimental and investigational.
- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

62. Despite written confirmation that both United and the Plan Administrator received the letters, Anne received no response to this request.

63. The denial of benefits for S.L.'s treatment was a breach of contract and caused Anne to incur medical expenses that should have been paid by the Plan in an amount totaling over $300,000.

## **FIRST CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B) Against United and the Plan)**

64. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

65. United and the Plan failed to provide coverage for S.L.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

66. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

67. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled.

68. United failed to substantively respond to the issues presented in Anne's appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

69. With respect to the Elevations' claims, in particular, United refused or failed to identify any particular provision that the facility allegedly failed to satisfy despite multiple direct and explicit requests.

70. United and the agents of the Plan breached their fiduciary duties to S.L. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in S.L.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of S.L.'s claims.

71. The actions of United and the Plan in failing to provide coverage for S.L.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity and facility eligibility criteria.

72. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first, second, and third causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

//

//

16

**SECOND CAUSE OF ACTION**

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3)
Against United and the Plan)**

73. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

74. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

75. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

76. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

77. The medical necessity and facility eligibility criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive

17

than the criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

78. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for S.L.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

79. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

80. United and the Plan evaluated S.L.'s mental health claims using criteria and internal practices that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

81. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

82. Plaintiffs specifically identify three violations of MHPAEA. The first is that the requirements United imposed on mental health services were stricter than those applied to analogous medical or surgical care.

83. The second involves United blacklisting certain mental health facilities, including Elevations, based on factors which, whether disclosed or undisclosed, resulted in mental health care being denied when analogous medical or surgical care would not have been.

84. The third is that United's actions in blacklisting Elevations creates a network disparity between contracted residential treatment centers and contracted sub-acute inpatient facilities providing comparable medical and surgical benefits and created lack of coverage for S.L.'s treatment at Elevations in a way that violated MHPAEA.

85. Plaintiffs asked for additional detail about United's denials which would have allowed them to articulate these arguments with more specificity, but United refused or failed to provide it.

86. Plaintiffs asked United to produce any evidence of it blacklisting analogous medical or surgical facilities in the same way, but United was unwilling or unable to do so.

87. United and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that United and the Plan were not in compliance with MHPAEA.

88. The violations of MHPAEA by United and the Plan are breaches of fiduciary duty and give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the criteria and/or internal practices utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

## THIRD CAUSE OF ACTION

### (Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c) Against the Plan Administrator)

89. United, acting as agent for the Plan Administrator, is obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan and United, the medical necessity criteria for mental health and substance abuse and medical necessity criteria for skilled nursing and rehabilitation facilities.

90. In spite of Anne and Tom's requests during the prelitigation appeal process for United to produce the documents under which the Plan was operated, United repeatedly failed to produce to the Plaintiffs the documents under which the Plan was operated, including but not limited to any administrative service agreements between the Plan and United, the medical necessity criteria for mental health and substance abuse, and medical necessity criteria for skilled nursing and rehabilitation facility treatment within 30 days after they had been requested.

91. After United repeatedly failed to provide these materials, Anne sent one final letter dated January 23, 2024, to both United and the Plan Administrator again requesting the documents which she was statutorily entitled to receive upon request. United and the Plan Administrator did not respond to Anne's request for documents.

92. The failure of the Plan Administrator and its agent United, to produce the documents under which the Plan was operated, as requested by the Plaintiffs, within 30 days of Anne's request for ERISA documents, provides the factual and legal basis under 29 U.S.C. §1132(a)(1)(A) and (c) for this Court to impose statutory penalties against the Plan Administrator up to $110 per day from 30 days from the date of each of these letters to the date of the production of the requested documents.

93. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1.  Judgment in the total amount that is owed for S.L.'s medically necessary treatment at UNI and Elevations under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.  Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.  For an award of statutory penalties of up to $110 a day against the Plan Administrator after the first 30 days for each instance of the Plan Administrator and its agent United's failure or refusal to fulfill their duties, to provide the Plaintiffs with the documents they had requested.

4.  Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5.  For such further relief as the Court deems just and proper.

DATED this 20th day of February, 2025.

By _____s/ Brian S. King_____
Brian S. King
Attorney for Plaintiffs

County of Plaintiffs' Residence:
Hartford County, Connecticut